IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EVERLIDIS BONILLA, Individually** | : | |
| **and as Personal Representative for** | : | |
| **the ESTATE OF JUAN BONILLA,** | : | |
| **JR.,** | : | |
| | : | **Civil No. 1:14-CV-2238** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE CITY OF YORK,** | : | |
| **PENNSYLVANIA, YORK CITY** | : | |
| **POLICE DEPARTMENT, OFFICER** | : | |
| **CHRISTOPHER ROOSEN, WEST** | : | |
| **MANCHESTER TOWNSHIP,** | : | |
| **WEST MANCHESTER TOWNSHIP** | : | |
| **POLICE DEPARTMENT, and** | : | |
| **OFFICER MICHAEL JORDAN,** | : | |
| | : | **Judge Sylvia H. Rambo** |
| **Defendants** | : | |

# M E M O R A N D U M

In this Section 1983 civil rights action, Plaintiff brings claims both individually and on behalf of the estate of her deceased son against two police officers and their respective municipalities, asserting violations of the decedent's Fourth Amendment rights, as well as pendent state law claims. Specifically, Plaintiff alleges that the two police officers used excessive force by fatally shooting the decedent in response to a shootout that he was involved in outside of a nightclub. Presently before the court are Defendants' motions for summary judgment and several motions seeking to exclude, *inter alia*, Plaintiff's purported expert and his reports. For the reasons stated herein, Defendants' motions to

exclude Plaintiff's expert and strike his reports will be granted and their motions for summary judgment will be granted in their entirety.

## I.   **Background**

In considering Defendants' instant motions for summary judgment, the court relied on the uncontested facts or, where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to Plaintiff as the nonmoving party in accordance with the relevant standard when deciding a motion for summary judgment.  See *Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 362 (3d Cir. 2008).

### A.   **Facts**

#### 1.   **The Events of November 24, 2012**

This action arises out of an incident that took place on or about November 24, 2012, when Plaintiff Everlidis Bonilla's son, Juan Bonilla, Jr. ("Bonilla"), went to a private nightclub in York, Pennsylvania known as "Ada's," and became involved in a dispute with other patrons.  (Doc. 44, Defendants' Statement of Material Facts ("SMF"), ¶ 18.)  Bonilla discharged his firearm inside Ada's amidst several patrons.  (*Id*. at ¶¶ 19-20.)  Defendant Officer Christopher Roosen ("Officer Roosen") of the York City Police Department and Defendant Officer Michael Jordan ("Officer Jordan") of the West Manchester Township Police Department

each received police dispatch calls of a man with a weapon and shots fired at Ada's.  (*Id*. at ¶¶ 21-22.)

Officer Roosen was the first officer to arrive at the scene and parked his patrol vehicle facing north in the parking lot, followed shortly thereafter by Officer Jordan, who parked his patrol vehicle next to Officer Roosen's.  (*Id*. at ¶¶ 22, 27, 32-33.)  After the officers exited their vehicles and began discussing how to handle the situation, patrons began pouring out of Ada's.  (*Id*. at ¶¶ 34, 39.)  As those patrons began to get into their cars and exit the parking lot, Officers Roosen and Jordan saw Bonilla exit the bar and begin to fire several more gunshots.  (*Id*. at ¶¶ 45-47.)  Both officers drew their weapons and fired upon Bonilla.  (*Id*. at ¶¶ 50-51.)  Bonilla continued to discharge his firearm and moved at a fast pace southbound from Ada's parking lot toward the adjacent parking lot of a Royer's Flower Shop.  (*Id*. at ¶ 52.)  Officer Roosen began moving away from Officer Jordan in a northwest arc in order to position himself to the rear of Bonilla, and observed that Bonilla appeared to be running after and shooting at a two-tone blue and grey minivan that was driving toward Route 30 in an attempt to leave the parking lot.  (*Id*. at ¶¶ 53-56.)

The driver of the minivan, Samantha Sheeler, and the front passenger, Norman Smith, noticed a man running along the passenger side of the minivan and saw the officers firing their weapons.  (*Id*. at ¶¶ 57-59, 62.)  Officer Roosen feared

for the safety of the minivan occupants, and fired at the center mass of Bonilla's back once he had a clear shot. (*Id*. at ¶¶ 69-70.) Officer Roosen then witnessed Bonilla appear to stumble and dip to his left, put his arms out to his sides, and throw an unidentified object from his hand. (*Id*. at ¶¶ 71-72.) After Bonilla threw the object, Officer Roosen ceased firing further shots because he perceived the imminent threat from Bonilla to be over. (*Id*. at ¶ 73.)

During this time, Officer Jordan lost sight of Bonilla momentarily because his view of Bonilla was obstructed by the minivan. (*Id*. at ¶ 76.) Officer Jordan did not see Bonilla toss the object from his hand, and when Bonilla reemerged into Officer Jordan's view, he appeared to be unsteady on his feet. (*Id*. at ¶¶ 77-78.) As Bonilla staggered toward the grassy median in the parking lot and fell face down approximately fifteen yards away, Officer Jordan repeatedly screamed for Bonilla to show his hands. (*Id*. at ¶¶ 79-81.) Bonilla raised up slightly as he rolled onto his right side and said "yo yo really," and then went back to the ground. (*Id*. at ¶ 82.) Officer Jordan again instructed Bonilla to show his hands, but Bonilla instead began to rise off the ground for a second time, and Officer Jordan fired another shot at Bonilla's center mass. (*Id*. at ¶¶ 83-84.) After the shooting threat from Bonilla was neutralized, other officers from the City of York Police Department arrived on the scene. (*Id*. at ¶¶ 85-86.)

## 2.      Investigations Into the Shooting

Following the shooting of Bonilla, the Pennsylvania State Police ("PSP") commenced an official investigation into Bonilla's death, including the production of an investigative file, a Homicide Investigation Report, a Coroner's Report, a Ballistics Report, and an Autopsy Report.  (*Id*. at ¶¶ 89-94, 108.)  The investigation concluded that Bonilla suffered gunshot wounds to his chest and left thigh, and that he was still armed when he received the wound to the thigh.  (*Id*. at ¶¶ 95-96.)  The Autopsy Report identified the gunshot wound to the chest as the cause of death, finding that the bullet entered Bonilla's back in the left infrascapular region and exited his chest.  (*Id*. at ¶¶ 97-98.)  A large caliber, deformed bullet was recovered from the superior left aspect of Bonilla's shoulder during the autopsy (Doc. 52-1, Autopsy Report, p. 4 of 13), and the Ballistics Report found that the bullet was not fired from Officer Jordan's gun.  (*Id*. at ¶¶ 99, 112.)

Along with the above reports, the PSP also conducted interviews of fifty-two persons who were identified as being present at Ada's during the early morning hours of November 24, 2012.  (*Id*. at ¶ 113.)  The PSP's investigation concluded that Bonilla was attempting to shoot another individual who was fleeing from Ada's after an altercation inside the club and that Officers Roosen and Jordan fired their service weapons at Bonilla in an attempt to neutralize him.  (*Id*. at ¶¶114-15.)

On January 21, 2014, York County District Attorney Tom Kearney issued a memorandum in which he concluded that the use of deadly force by Officers Roosen and Jordan was reasonable. (*Id*. at ¶ 116.) The Internal Affairs Division of the City of York Police Department conducted its own investigation into the shooting of Bonilla, and similarly found that Officer Roosen's actions reasonable because he had a duty to immediately stop an active shooter event. (*Id*. at ¶¶ 119-20.) The Internal Affairs Division concluded that no changes to the police department's training curriculum were necessary. (*Id*. at ¶ 121.)

### 3.   City of York Police Department's Use of Force Policy

The City of York has a comprehensive use of force policy that is compliant with both federal and state law, as well as the Pennsylvania Law Enforcement Accreditation Program which was designed by the Pennsylvania Chiefs of Police Association. (*Id*. at ¶ 122.) The policy requires police officers to employ an escalating continuum of force, from no actual force all the way up to deadly force, and dictates that officers employ the least amount of force necessary in the present circumstances as determined by what reasonably appears to be the facts known or perceived by the officer at the time he or she decides to use such force. (*Id*. at ¶ 123.) Under the policy, an officer may only employ lawful and justified use of deadly force when he or she believes one of the following: (1) that such force is in defense of human life or to prevent imminent serious physical injury; (2) such

force is necessary to prevent an arrest being defeated by resistance or escape and the person to be arrested has committed or attempted a forcible felony, or is attempting to escape and possesses a deadly weapon, or otherwise indicates he or she will endanger human life or inflict serious bodily injury unless arrested without delay. (*Id.* at ¶¶ 125-26.)

### 4.   Officer Training

Officer Roosen testified that he received annual training in firearms, the use of force, and defensive tactics from 2008 to 2010 at two police departments in the State of Michigan that employed him before he was hired by the City of York Police Department, but he did not testify as to any training he received from the City of York Police Department.  (Doc. 44-1, pp. 8-11 of 50.)  Officer Jordan receives annual firearms and use of deadly force training from the Municipal Police Officers' Education and Training Commission, as well as annual use of force training and semi-annual firearms training and qualification from the West Manchester Township Police Department.  (Doc. 44, ¶¶ 128-130.)  The police department's annual use of force training includes a review of its use of force policy.  (*Id.* at ¶ 130.)  In 2012, Officer Jordan also underwent training from his police department on the use of less lethal force and the use of force in tactical scenarios.  (*Id.* at ¶¶ 133-34.)

### B.    <u>Procedural History</u>

Plaintiff initiated this action by filing a complaint on November 21, 2014. (Doc. 1.)  In her complaint, Plaintiff asserted several constitutional claims pursuant to 42 U.S.C. § 1983, and named six defendants, including Officers Roosen and Jordan, and their respective police departments and municipalities.  (*Id.*)  Plaintiff claims, *inter alia*, that the use of excessive force by Officers Roosen and Jordan in fatally shooting Plaintiff's son constituted an unlawful seizure in violation of the Fourth Amendment (*id.* at ¶¶ 41-43, 49-51), and constituted assault, battery and wrongful death under Pennsylvania state law (*id.* at ¶¶ 52-65).[1]  Plaintiff further claimed that Defendants City of York, York City Police Department, West Manchester Township and West Manchester Township Police Department (collectively, the "Municipal Defendants") are liable for failure to train the officers properly in the use of deadly force.  (*Id.* at ¶¶ 36-40 and 44-48.)

On February 2, 2015, Defendants Officer Jordan, West Manchester Township and West Manchester Township Police Department (collectively, the "West Manchester Defendants") jointly filed a motion to dismiss the claims asserted against them for failure to state a claim upon which relief can be granted (Doc. 18), and Defendants Officer Roosen, City of York and York City Police Department (collectively, the "York Defendants") jointly filed their own motion to

---

[1] Plaintiff also brought a survival action claim due to the wrongful death of her son.  (Id. at ¶¶ 66-73.)

dismiss for failure to state a claim (Doc. 17).  By memorandum and order dated April 2, 2015, the court found that the complaint stated a plausible claim that Officers Roosen and Jordan violated Bonilla's Fourth Amendment rights by unlawfully seizing him through the use of excessive force, and the facts supporting the excessive force claim also establish Plaintiff's state law claims for assault, battery, wrongful death, and survival, and leave open the possibility of recovery of punitive damages against Officers Roosen and Jordan in their individual capacities. *See Bonilla v. City of York, Pa.*, Civ. No. 14-cv-2238, 2015 WL 1525483, *10 (M.D. Pa. Apr. 2, 2015).  The court also found that Plaintiff plead facts in the complaint that state a plausible claim against West Manchester Township and the City of York for failure to train their police officers in the use of deadly force, but that Plaintiff's claims against West Manchester Township Police Department and York City Police Department failed as a matter of law, as did Plaintiff's punitive damages claims against West Manchester Township and the City of York.  *See id.* Accordingly, several claims survived Defendants' motions to dismiss, and the parties engaged in discovery.

On March 21 and 22, 2016, York Defendants and West Manchester Defendants filed respective motions for summary judgment (Docs. 45 & 47), briefs in support (Docs. 46& 48), and a joint statement of facts (Doc. 44).  On April 11, 2016, Plaintiff filed an opposition to the motions for summary judgment (Doc. 53)

as well as her own statement of facts (Doc. 52).  Defendants subsequently filed joint motions *in limine* to exclude witness statements filed after the discovery deadline (Doc. 54) and expert testimony and reports submitted by Plaintiff in opposition to the motions for summary judgment (Doc. 56), as well as a motion to strike Plaintiff's statement of facts (Doc. 60).

On May 6, 2016, Plaintiff filed a motion for leave to file an amended complaint (Doc. 87), which Defendants oppose (Doc. 102).  The motions for summary judgment, motions *in limine*, and motion for leave to file an amended complaint have all been fully briefed and are ripe for disposition.  Because the motion to amend the complaint and motions *in limine* would impact the record for summary judgment, the court will address those motions first before turning to the motions for summary judgment.

## II.    Motion for Leave to File an Amended Complaint

Generally, leave to amend a pleading pursuant to Federal Rule of Civil Procedure 15(a) should be "freely give[n] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, a court need not grant leave to amend in the presence of bad faith, undue delay, undue prejudice, or futility.  *See Diaz v. Palakovich*, 448 F. App'x 211, 215-16 (3d Cir. 2011) (citing *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000)); *see also Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993). "Delay becomes 'undue,' and thereby creates grounds for the district court to

refuse leave, when it places an unwarranted burden on the court or when the plaintiff has had previous opportunities to amend." *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008) (citation omitted). Even where there is no undue delay, prejudice to the non-moving party remains the touchstone for the denial of a motion to amend. *Arthur v. Maersk, Inc.*, 434 F.3d 196, 202 (3d Cir. 2006). The court must consider whether granting leave to amend the complaint "would result in additional discovery, cost, and preparation to defend against new facts or new theories." *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001).

In addition to bad faith, undue delay, undue prejudice, and futility, "a court has discretion to deny an amendment if such action was done for an improper purpose." *Prescod v. Bucks County*, Civ. No. 08-cv-3778, 2009 WL 3617751, *6 (E.D. Pa. Nov. 2, 2009) (citing *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2003)). Motions to amend filed after a summary judgment motion has been submitted are highly disfavored. *See Cureton*, 252 F.3d at 273. When a plaintiff files a motion to amend after the filing of a defendant's motion for summary judgment, the timing "raises an inference that the plaintiff is attempting to bolster his legal position – and therefore avoid summary judgment – by amending the complaint. This is an unacceptable reason to amend." *Fatir v. Dowdy*, Civ. No. , Civ. No. 95-cv-0677, 2002 WL 2018824, *8 (D. Del. Sept. 4,

2002) (citing *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 806 (1st Cir. 1987)) (affirming district court's denial of leave to amend where the request to amend the complaint appeared to be "an attempt to avoid an adverse ruling on summary judgment"); *see also Reyes v. Pac. Bell*, 21 F.3d 1115, 1115 n.4 (9th Cir. 1994) ("We note also that [plaintiff]'s motion to amend his complaint was filed only after [defendant] had filed its motion for summary judgment.  A motion to amend should not be used as a way to defeat a motion for summary judgment, and thus the timing of [plaintiff]'s motion strongly supports the district court's decision to deny it.").

Here, Plaintiff requests leave to amend her complaint to now allege that Bonilla dropped his gun before being shot in the leg, rather than simultaneously with or just after being shot.  (*See* Doc. 87.)  Plaintiff's motion for leave to amend comes after both sets of Defendants filed their respective motions for summary judgment and well after discovery ended.  Plaintiff's request appears to be an attempt to bolster her argument that the officers used excessive force when attempting to subdue Bonilla on the night in question, and therefore a clear effort to avoid summary judgment.  As stated above, such an attempt is an improper reason for amending a complaint, and Plaintiff's motion for leave to amend the complaint will be denied.

### III.   Motions *In Limine*[2]

#### A.   Motion to Exclude Submissions After the Discovery Deadline

In support of her opposition to Defendants' motions for summary judgment,

Plaintiff designated Charles Randy Tuer ("Mr. Tuer"), a former police officer and

current private investigator, as an expert witness, and submitted several reports

generated by Mr. Tuer related to the events that lead to Bonilla's death.  Plaintiff

also attached a written statement, taken after the close of discovery, by Samantha

Sheeler.  (Doc. 52, Ex. 17.)  Defendants argue that the final two reports issued by

Mr. Tuer and the Sheeler statement were received after the end of discovery and

should be excluded.  Defendants further argue that even if the court were to accept

the Sheeler statement as timely, it nonetheless consists of inadmissible hearsay and

should be excluded from both the summary judgment record and from trial.  (Doc.

55, p. 4 of 5.)  Plaintiff acknowledges that the Tuer reports and Sheeler statement

were submitted after the close of discovery, but argues that she learned of the

---

[2] Along with the motions discussed below, Defendants also jointly filed a motion to strike Plaintiff's statement of facts and to strike Plaintiff's attempt to amend the complaint without seeking leave of the court or concurrence from Defendants. (*See* Doc. 60.) The court notes that Plaintiff failed to comply with Local Rule 56.1, which requires a statement of material facts to be short, concise, and in numbered paragraphs. *See* M.D. Pa. L.R. 56.1.  Plaintiff's lengthy, meandering, unnumbered statement of facts undoubtedly made Defendants' task in responding more difficult, and it is within the court's discretion to deem Defendants' statement of facts admitted for Plaintiff's violation of Local Rule 56.1. *See id.*  However, as stated above, the court attempts to resolve cases on the merits rather than on procedural missteps by counsel.  For this reason, and because Defendants were able to file a meaningful response to Plaintiff's statement of facts, the court will deny Defendants' request to strike Plaintiff's statement of facts or to deem Defendants' statement of facts admitted.  In addition, Defendants' request to strike Plaintiff's attempt to amend the complaint is now moot because Plaintiff subsequently filed a motion for leave to amend the complaint, which the court has disposed of herein.

information contained in the reports and statement only after discovery had ended, and that she submitted them as soon as possible.  Plaintiff also admits that the Sheeler statement contains hearsay and that Ms. Sheeler will need to testify at trial as to the information contained in the statement, but argues that the statement is appropriate for the summary judgment record.  The court will address the Tuer reports and Sheeler statement in turn.

### 1.    The Tuer Reports

On May 12, 2015, the court issued a case management order in this matter, which required any supplemental expert reports to be produced by March 4, 2016. (Doc. 39.)  Defendants subsequently agreed to a request by Plaintiff to extend the deadline for any supplemental expert reports to March 18, 2016.  (Doc. 55, p. 2 of 5.)  Plaintiff did not produce the final two Tuer reports, however, until April 11, 2016, twenty-one days after Defendants filed their motions for summary judgment.

Defendants point to Federal Rule of Civil Procedure 26(a)(2)(D), which states that a party must disclose its expert witness according to court orders, as the basis for excluding the final two Tuer reports.  *See* Fed. R. Civ. P. 26(a)(2)(D). However, because the final two reports were supplemental expert reports, rather than the initial report, Rule 26(e)(2) governs.  Rule 26(e)(2) states that "[a]ny additions or changes to [an expert's report] must be disclosed by the time of the party's pre-trial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2).

Rule 26(a)(3), in turn, requires that pre-trial disclosure "must be made at least 30 days before trial." Fed. R. Civ. P. 26(a)(3)(B). Jury selection and trial in this matter is scheduled to commence on June 20, 2016. (*See* Doc. 78.) Accordingly, Plaintiff's submission of the supplemental expert reports more than sixty days in advance of trial is in compliance with Rule 26 and will not be precluded for being untimely.[3]

## 2. The Sheeler Statement

Plaintiff submitted the Sheeler statement along with the supplemental Tuer reports, on April 11, 2016. The statement appears to have been prepared either by Mr. Tuer or Plaintiff's counsel, as it states that "[t]his typed statement was later presented to me for signatures and although it is not in my exact words, it accurately represents the facts and information that I provided to Mr. Tuer and [Plaintiff's counsel] during our meeting [of April 5, 2016]." (Doc. 52, Ex. 17, p. 1 of 3.) The statement goes on to list the witness's answers to several questions posed to her by Mr. Tuer. Defendants object to the statement both because it was submitted after the close of discovery and because it contains hearsay. First, Defendants have not alleged that the untimeliness of the Sheeler statement has unduly prejudiced them or would cause any delay of trial. This court prefers to resolve cases on the merits, rather than procedural technicalities, and thus will not

---

[3] Defendants have also submitted a *Daubert* motion seeking to exclude the Tuer reports on the basis that he is not qualified as an expert, and that motion is addressed below.

exclude the statement merely because it was filed after discovery ended.  Second, while Defendants correctly point out that inadmissible hearsay cannot be considered on a motion for summary judgment, *see Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009), if the hearsay is capable of admission at trial, it may be considered at summary judgment, *see Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 at n.2 (3d Cir. 2000).  Sheeler's recollection of the events of the evening in question in this case would be admissible through testimony at trial without the need for her references to Mr. Tuer's questions.  Because her same statements would be admissible at trial, the court may consider them at summary judgment.  Accordingly, the court will not exclude the Sheeler statement from the summary judgment record.

## B.   *Daubert* Motion

As stated above, Plaintiff has designated Mr. Tuer as an expert witness in this action, and in various reports Mr. Tuer has opined on medical issues, ballistics and firearms, and police policies and practices, all of which are relevant to the outcome of this case.  Defendants object to Mr. Tuer as an expert because he is not properly qualified as an expert in the fields mentioned above, and because the testimony contained in his reports impermissibly opines as to the ultimate legal issue in this case, namely whether Officers Roosen and Jordan used excessive force when fatally shooting Bonilla.  (Doc. 90, p. 2 of 11.)

In response to Defendants' arguments, Plaintiff argues that Mr. Tuer is in fact qualified to give expert testimony due to his twenty-one years spent as a police officer for the Baltimore County Police department, the fact that he once had to use deadly force in the line of duty and underwent an investigation as to whether the force was justified, and his experience as a licensed, bonded, and insured private investigator for nearly ten years. (Doc. 85, pp. 7-8 of 12.)

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. *See Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 588-89 (1993). The rule requires that an expert witness be qualified through "knowledge, skill, experience, training, or education," and provides that an expert may give opinion testimony if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand evidence or determine a fact in issue; (2) the testimony is based upon sufficient facts or data; (3) the testimony is the product of reliable principles or methods; and (4) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. A trial court must act as a gatekeeper "to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" *Pineda v. Ford. Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).

Here, Mr. Tuer does not meet the initial requirement of being qualified through knowledge, skill, experience, training, or education to give opinion testimony on medical or forensic issues.  Despite giving his opinion on several medical issues, such as how far a man shot through the leg or heart would likely be able to travel and whether someone who has been shot would reflexively reach for the area causing the pain, in his own investigative reports, Mr. Tuer makes statements such as, "[a] physician would be the person to present this as an expert," and, "[a]s a non-expert in the field of forensic pathology, I am obviously not qualified to render a 'professional' opinion about the autopsy . . ." (Doc. 56-7, pp. 7, 13 of 41.)  Mr. Tuer also testified that he has never received any medical training other than wound treatment and first responder training while he was employed as a police officer.  (Doc. 56-12, pp. 13-14 of 17.)  Even if Mr. Tuer were qualified to testify as an expert through specialized knowledge or experience, he has given no methodologies that he used in coming to his conclusions that would give the court any confidence as to the reliability of his testimony.  Thus, the court finds that Mr. Tuer is not qualified to give expert medical testimony, and he will not be allowed to do so at trial.  Additionally, any such medical opinion testimony contained in his investigative reports, including when and where Bonilla may have sustained gunshot wounds and any physical signs of or reactions to

gunshot wounds, are stricken from the summary judgment record and will not be considered by the court.

Similarly, Mr. Tuer testified that, aside from the annual or semi-annual firearm certification he received as a police officer, he never received any specialized training in ballistics, never taught any courses on ballistics, and has never testified in any court as an expert in ballistics.  (Doc. 56-12, pp. 16-17 of 17.) As with his conclusions regarding medical issues, Mr. Tuer has not given any methodologies used in his ballistics analysis that would suggest reliability of his testimony.  Ineed, Mr. Tuer's own investigative report stated that the "theory that [Officer] Roosen fired the fatal round is unsupported by evidence and seems illogical on its face."  (Doc. 56-9, p. 6 of 7.)  Yet Mr. Tuer's theory that Officer Jordan, rather than Officer Roosen, fired the fatal shot was proven to be scientifically impossible when the ballistics report analyzing the bullet found in Bonilla's sweatshirt disqualified Officer Jordan's weapon from having fired the fatal shot.  While Mr. Tuer changed his belief based on this ballistics report in his final investigative report, his initial theory that Officer Jordan fired the fatal shot – based off of his own analysis of the shell patterns on the ground, positions from which the officers were firing upon Bonilla, and trajectories of the bullets fired – proved to be wrong.  Accordingly, the court finds that Mr. Tuer is not qualified to give opinion testimony in pre-trial reports or at trial regarding bullet trajectories,

where or when Bonilla was shot, the likely path a bullet traveled, or other information that would require expertise in ballistics. Mr. Tuer will not be permitted to testify at trial regarding ballistics issues, and all such statements in his pre-trial reports are stricken from the summary judgment record.

Although the court finds that Mr. Tuer is not qualified to testify as an expert with regard to medical, forensic, or ballistics issues, the court will not disqualify Mr. Tuer from testifying as an expert as to police policies and practices related to the use of force. As stated above, Mr. Tuer spent more than twenty years as a police officer and received frequent training in the use of force. In addition, Mr. Tuer has spent the past ten years as a private investigator conducting numerous investigations, including two cases involving police shootings. (Doc. 85, p. 8 of 12.) Mr. Tuer stated in his investigative reports that he reviewed the use-of-force policies of both York City's and West Manchester Township's police departments, and as he expected, found them both similar to one another and to the use-of-force policy of his former employer, the Baltimore County Police Department. (Doc. 56-8, p. 3 of 7; Doc. 56-9, p. 2 of 7.) The court finds that Mr. Tuer is qualified to testify regarding police use-of-force policies and whether the actions of Officers Roosen and Jordan on the night in question complied with those respective policies.

Mr. Tuer will not, however, be permitted testify as to whether the officers' actions constituted excessive force as that is defined in relation to a Section 1983 claim for violation of Fourth Amendment rights.  "While Rule 704 allows experts to provide an opinion about the 'ultimate issue' in a case, it prohibits experts from opining about the ultimate legal conclusion or about the law or legal standards." *Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013) (first citing *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006); then citing *United States v. Leo*, 941 F.2d 181, 196–97 (3d Cir. 1991)).  Indeed, "expert testimony becomes impermissible if the expert's opinion would interfere with the district court's 'pivotal role in explaining the law to the jury.'"  *Id.* (citing *Berckeley*, 455 F.3d at 217).  Accordingly, Mr. Tuer will not be allowed to testify as to whether Officers Roosen and Jordan used excessive force when engaging Bonilla, and all such references in his investigative reports will be stricken from the record.

## IV.  **Motions for Summary Judgment**

The York Defendants filed a joint motion for summary judgment as to Plaintiff's claims (Doc. 45), as did Officer Michael Jordan (Doc. 47).  Because the motions use similar arguments to challenge Plaintiff's claims, they will be addressed together.

## A. **Legal Standard**

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for granting summary judgment.  Rule 56(a) provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the nonmoving party.  *Id.* at 248.  When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party," and draw all reasonable inferences in favor of the same.  *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact.  *See Celotex*, 477 U.S. at 324.  "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).  The

nonmoving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp*, 260 F.3d 228, 232 (3d Cir. 2001).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23.  "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance."  *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## B.   <u>Discussion</u>

Defendants challenge Plaintiff's claims for constitutional violations due to the use of excessive force against the individual police officers on two bases: (1) the officers' use of deadly force under the circumstances was objectively reasonable, and therefore there is no constitutional violation and the pendent state claims are likewise extinguished; and (2) even if there was a constitutional

violation, the officers are entitled to qualified immunity.[4]  (*See* Doc. 46, pp. 3-10; Doc. 49, pp. 3-4, 8-13.)  In addition, Defendants argue that Plaintiff's state law claims against the individual officers fail because they are prohibited by Pennsylvania's Political Subdivision Tort Claims Act (the "Tort Claims Act"), 42 Pa. Con. Stat. §§ 8541, and because the officers used reasonable force pursuant to a lawful arrest.  (*See* Doc. 46, pp. 12-14; Doc. 49, pp. 13-15.)  Defendants further argue that they should be awarded judgment on Plaintiff's claims for punitive damages because the officers did not act with reckless or callous disregard or indifference to the rights of others.  (*See* Doc. 46, pp. 14-15.)  Lastly, Defendants argue that Plaintiff's *Monell* claim against the City of York fails because there is no underlying constitutional violation by Officer Roosen and because Plaintiff has not identified any policy or custom attributable to the City of York that is causally linked to Bonilla's death.  (*See id*. at pp. 10-12.)  Plaintiff opposes Defendants' arguments, relying almost entirely on the deposition testimony of witness Lizarah Matthews ("Ms. Matthews") to support Plaintiff's new theory that Bonilla was unarmed before being shot either in the back or the thigh.  The court finds it expedient to address Ms. Matthews' deposition testimony as an initial matter, and will then address Defendants' arguments in turn.

---

[4] Officer Jordan argues in addition that there is no claim against him for excessive force because he was excluded from having fired the shot to Bonilla's back and Plaintiff does not assert a constitutional claim for the shot to Bonilla's thigh.  (See Doc. 49, pp. 5-7.)

## 1.    Matthews' Testimony

On February 12, 2016, Ms. Matthews testified as follows: On the night of November 24, 2012, she went to a bar with a friend and consumed approximately three alcoholic drinks.  (Doc. 52-2, p. 56 of 246.)  When the bar closed at around 2 a.m., she and her friend went to Ada's, but within five to ten minutes of their arrival, they decided to leave because a fight was escalating.  (*Id*. at pp. 57, 59-61 of 246.)  While they were walking back to the friend's car, Ms. Matthews heard a gunshot and they ran to the car.  (*Id*. at p. 65 of 246.)  As they were trying to leave the parking lot, a police officer pulled up in his vehicle and blocked them from leaving.  (*Id*. at p. 71 of 246.)  Bonilla came running up along the passenger side of the car, and the police officer exited his vehicle, gun drawn, and told Bonilla to put his gun down.  (*Id*. at pp. 80-82, 84 of 246.)  Bonilla dropped his gun, put his hands in the air, and as he was walking toward the police officer, the officer shot Bonilla in the left leg, causing him to kneel and then fall to the ground.  (*Id*. at pp. 84, 89 of 246.)  Ms. Matthews also heard two other gunshots that sounded like they were coming from near the Royer's flower shop.  (*Id*. at p. 86 of 246.)

Ms. Matthews was then questioned about a prior statement she had given to Mr. Tuer in 2014 which contained several contradictions to her deposition testimony.   Namely, she told Mr. Tuer in 2014 that she noticed Bonilla simultaneously drop his gun, put his hands up and begin "wobbling on one of his

legs," (Doc. 79-1, p. 30 of 32), but at her deposition, she testified that Bonilla

dropped his gun, raised his hands, and began walking toward the officer before

being shot in the leg and kneeling to the ground.  (*Id*. at p. 14 of 32.)  When asked

if her statement to Mr. Tuer that Bonilla's leg wobbled and then he dropped the

gun was true, however, Ms. Matthews responded that it was.  (*Id*. at p. 25 of 32.)

Only moments later in her deposition, Ms. Matthews stated:

> I don't remember if it was from behind or from the front
> . . . I don't know if he was shot before he turned around
> or after he was already around . . . [b]ut I know when he
> [] dropped his gun, he had his hands up.  And maybe
> that's why he was wobbling.  I don't remember, honestly
> . . . I'm trying to put the pieces together.  But I know he
> was wobbling when he turned around and was trying to
> come towards that way.

(*Id*. at p. 26 of 32.)  Ms. Matthews' testimony is so inconsistent as to be wholly

unreliable.[5]   In addition to her own inconsistent statements, Ms. Matthews

testimony is also contradicted by other evidence of record.  For instance, Ms.

Matthews testified at her deposition that an officer pulled into the parking lot,

exited his vehicle, and told Bonilla to drop the gun, well after the club had emptied

and shots had been fired outside.  Both Officers Roosen and Jordan, however,

---

[5] Ms. Matthews' testimony is riddled with other inconsistencies, including: that she saw Bonilla running with the gun and shooting, but then never saw him with a gun (*id*. at pp. 15, 19 of 32); that she saw Bonilla hiding and crouching in some bushes next to Royer's while firing five or six shots toward Route 30, but then never saw Bonilla crouching near the bushes or shooting (*id*. at pp. 15, 17, 19, 31 of 32.); and, that she heard ten to fifteen gunshots before the police shot Bonilla, then she heard only two gunshots, then did not hear any gunshots until Bonilla went down (*id*. at pp. 15, 16, 29 of 32).

testified that they parked and exited their vehicles and discussed how to deal with the dispatch call before people began pouring out of Ada's, and that no other officers arrived on the scene until after Bonilla had been neutralized.  In addition, Ms. Matthews' statement that Bonilla was walking toward an officer with his hands up when he was shot in the leg is contradicted by the physical evidence in the Autopsy Report which establishes that the bullet entered the back of Bonilla's leg, not the front.

The court is mindful that "at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." *Everett v. Nort*, 547 F. App'x 117, 122 (3d Cir. 2013) (quoting *Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998)).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  "[T]he dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Liberty Lobby, Inc.*, 477 U.S. at 248.  Based on the above, the court finds that no reasonable jury could believe Ms. Matthews' testimony.  The crux of Plaintiff's reliance on Ms. Matthews'

deposition testimony is that Bonilla was unarmed even before he was shot in the leg. However, near the end of her deposition, the following exchange occurred:

> Q.   Ok.   And as – you sit here today, is it your testimony that you're not sure whether the Officer shot at Mr. Bonilla before or after he dropped the gun?
>
> A.   Yes.
>
> Q.   Ok. So it could have been before?
>
> A.   Yes.
>
> Q.   And it could have been after?
>
> A.   Yes.
>
> Q.   You just don't know?
>
> A.   Yes.

(Doc. 83-1, p. 3 of 3.)   Ms. Matthews clearly testified that she does not know whether Bonilla was shot before or after dropping his gun, and, therefore, there is no genuine issue of material fact.   Accordingly, the court will review Defendants' arguments according to the facts as relayed herein, namely, that Officer Roosen saw Bonilla stumble and toss his gun away, while Officer Jordan did not.

## 2.   Excessive Force

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Estate of Smith v. Marasco,* 318 F.3d 497, 515 (3d Cir. 2003)

(quoting *Abraham v. Raso,* 183 F.3d 279, 288 (3d Cir. 1999)).   "There can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."   *Williams v. Papi*, 30 F. Supp. 3d 306, 312 (M.D. Pa. 2014) (quoting *Tennessee v. Garner,* 471 U.S. 1, 7 (1985)).   Thus, the only remaining question is whether the seizure of Bonilla was reasonable.

"The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, 'the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.'"   *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Graham v. Connor,* 490 U.S. 386, 397 (1989)).   "Thus, if a use of force is objectively unreasonable, an officer's good faith is irrelevant; likewise, if a use of force is objectively reasonable, any bad faith motivation on the officer's part is immaterial."   *Estate of Smith*, 318 F.3d at 515 (citing *Abraham,* 183 F.3d at 289).   Factors that a court should consider in determining whether the force was objectively reasonable are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."   *Id*. (citing *Graham*, 490 U.S. at 396).   Additional factors to consider are "the duration of the action, whether the action takes place in the context of effecting an arrest, the

possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Kopec*, 361 F.3d at 777 (citation omitted).  As the Third Circuit has explained:

> An excessive force claim must be evaluated 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and 'must embody the allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are often tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'

*Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) (quoting *Graham,* 490 U.S. at 396-97).

While the question of reasonableness with regard to the use of force under the Fourth Amendment is typically one that is left for the jury, *Rivas*, 365 F.3d at 198 (citing *Abraham*, 183 F.3d at 290), when the factors above are applied to the undisputed facts in this case, it is clear that Officers Roosen and Jordan acted reasonably in using deadly force against Bonilla.  It is undisputed that Bonilla was armed with a gun and firing shots in a public place with several civilians present. The safety of the officers and the public was unquestionably threatened.  The factual question that defeated Defendants' motions to dismiss was whether the officer responsible for fatally shooting Bonilla knew or had reason to know that Bonilla was no longer armed when firing the fatal shot.  *See Bonilla*, 2015 WL 1525483 at *6.  That question no longer exists.  Officer Bonilla was scientifically

excluded from having fired the fatal shot by the Ballistics Report, and, even if he were not, he testified that he never saw Bonilla drop his gun and believed him to be armed throughout the encounter.  Officer Roosen testified that he saw Bonilla throw something from his hand, believed the imminent safety threat to be over, and fired no additional shots.  Therefore, based upon the undisputed evidence, neither Officer Jordan nor Officer Roosen fired the fatal shot at Bonilla with the knowledge, belief, or a reason to believe, that Bonilla was unarmed, and their use of deadly force upon an armed individual firing gunshots in a crowded public place was objectively reasonable.  Thus, both Officers Roosen and Jordan are entitled to summary judgment as to Plaintiff's Section 1983 claims for use of excessive force.

### 3.   Qualified Immunity

Qualified immunity "protect[s] officers from the sometimes 'hazy border between excessive and acceptable force.'"  *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).  An officer is entitled to qualified immunity when the officer makes a reasonable mistake as to what the law requires of him in a particular situation, *Saucier*, 533 U.S. at 205, and will be denied qualified immunity only where he has violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).  In determining whether to grant qualified immunity, the court

must determine (1) if the plaintiff has alleged sufficient facts to make out a violation of a constitutional right and (2) whether that right was clearly established. *Saucier*, 533 U.S. at 201.   "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. That the officer's actions were unconstitutional must be "beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

As discussed above, Plaintiff cannot satisfy the first prong because she has not sufficiently alleged a constitutional violation.  Even assuming, *arguendo*, that Plaintiff had alleged sufficient facts to support a constitutional violation, no reasonable officer would believe that using deadly force against an armed assailant who is firing multiple gunshots in a crowded public place is clearly unlawful, and Officers Roosen and Jordan would be entitled to summary judgment based on qualified immunity.

### 4.    *Monell* **Claim**

A municipality may be found liable under Section 1983 for the constitutional violations of its employees "where the municipality *itself* causes the constitutional violation at issue."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)).  A so-called *Monell* claim requires a plaintiff to "identify a municipal 'policy' or

'custom' that caused the plaintiff's injury." *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).  However, there is no municipal liability under *Monell* where there is no underlying violation of a constitutional right by the individual officers.  *See Kiriakidis v. Borough of Vintondale*, 609 F. App'x 713, 718 (3d Cir. 2015).  "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Accordingly, the court will award summary judgment to the City of York on Plaintiff's *Monell* claim.

### 5.    Assault and Battery

Under Pennsylvania law, an assault is "an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person."  *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (citation omitted).  "In making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the arrest.  The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery."  *Id.*

Plaintiff does not argue that Officers Roosen and Jordan lacked probable cause to arrest Bonilla when they observed him firing multiple gunshots at other people in a public place.   As discussed above with regard to Plaintiff's excessive force claim, the court finds that Officers Roosen and Jordan exercised reasonable force when engaging Bonilla.   Thus, because Officers Roosen and Jordan used reasonable force in an attempt to effectuate a lawful arrest, Plaintiff's claims for assault and battery fail as a matter of law and Officers Roosen and Jordan will be awarded summary judgment as to these claims.

### 6.   Wrongful Death and Survival Actions

"Wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death."   *Williams v. City of Scranton*, Civ. No. 10-cv-388, 2013 WL 1339027, *13 n.7 (M.D. Pa. Apr. 1, 2013) (quoting *Sullivan v. Warminster Twp.*, 765 F. Supp. 2d 687, 707 (E.D. Pa. 2011)).   Here, the unlawful conduct alleged by Plaintiff is the assault and battery by Officers Roosen and Jordan discussed above.   Because the assault and battery claims failed, so do Plaintiff's derivative actions for wrongful death and survival, and Officers Roosen and Jordan will be awarded summary judgment as to these claims as well.

### 7.    Punitive Damages

Plaintiff's lone remaining claim is a request for an award of punitive damages against Officers Roosen and Jordan in their individual capacities.[6] Claims for punitive damages pursuant to Section 1983 that are brought against police officers in their individual capacities require a plaintiff to establish that police officers acted with a "reckless or callous disregard of, or indifference to, the rights or safety of others." *Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)); *see also Brennan v. Norton*, 350 F.3d 399, 428-29 (3d Cir. 2003).   Such awards of punitive damages should be reserved, however, for "cases in which the [officer]'s conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief." *Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir. 1978).   As discussed extensively herein, Officers Roosen and Jordan committed no constitutional violation in their use of deadly force against Bonilla.   Rather than acting recklessly, the court finds that the officers acted reasonably under the circumstances.    Accordingly, Officers Roosen and Jordan will be awarded summary judgment on Plaintiff's claim for punitive damages.

---

[6] Plaintiff's requests for punitive damages against the municipal defendants and against the individual officers in their official capacities were dismissed as unavailable at law in the court's memorandum and order of April 2, 2015. *See Bonilla*, 2015 WL 1525483 at *10.

V.     **Conclusion**

For the reasons stated herein, the court finds that Officers Roosen and Jordan acted reasonably under the circumstances as they existed on the night of November 24, 2012 in deciding to exercise deadly force against an armed individual discharging a firearm in a public place.   Because there was no constitutional violation committed by the officers, there is no municipal liability for a failure to train.   Likewise, because the officers acted reasonably, Plaintiff's claims for assault and battery, along with the derivative wrongful death and survival actions, as well as Plaintiff's claim for punitive damages, all fail and Defendants are entitled to summary judgment.

An appropriate order will issue.


                                                     s/Sylvia H. Rambo
                                                    SYLVIA H. RAMBO
                                                    United States District Judge

Dated: June 7, 2016